**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES,

Plaintiff,

- against -

DELILAH CARRIEL,

Defendant.

**21-CR-93-13 (VM)**

**DECISION AND ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/6/26

**VICTOR MARRERO, United States District Judge.**

Defendant Delilah Carriel ("Carriel") is charged in a multi-defendant indictment with racketeering conspiracy, narcotics conspiracy, and use of a firearm in connection with a drug trafficking crime. (See Dkt. No. 275 (Ninth Superseding Indictment filed March 11, 2025).) Carriel now moves to suppress certain statements she made to law enforcement after her arrest. (See Dkt. No. 557 (Memorandum of Law in Support of Motion to Suppress Statements Dated March 18, 2026) (the "Motion" or "Mot.").) The Government has filed an opposition to Carriel's Motion. (See Dkt. No. 619 (Letter Opposition

Dated May 18, 2026) ("Opp.").)[1] Carriel did not file a reply. For the reasons that follow, Carriel's motion is **DENIED**.

## I. BACKGROUND

This Court assumes the parties' familiarity with the lengthy procedural posture and facts of this case and only recites the facts necessary to decide Carriel's Motion. Carriel was initially charged in the Seventh Superseding Indictment in this case, along with fifteen co-defendants. (See Dkt. No. 61 (Seventh Superseding Indictment) (the "Indictment").) The Court accepts the facts in the Indictment as true for the purposes of this Motion. See, e.g., United States v. Peraire-Bueno, No. 25-CR-293, 2025 WL 2062021, at *1 (S.D.N.Y. July 23, 2025).

### A. The Indictment

The Indictment alleged Carriel and her co-defendants were members of a drug trafficking gang known as the Valentine Avenue Crew that operated for decades in the Bronx. (See Indictment at 1.) The Valentine Avenue Crew distributed drugs and its members were regularly armed with firearms. (See id.)

[1] The Government's Opposition responds to both Carriel's motion and a separate motion by one of her co-defendants, Jamil Banks. (See Opp. at 1.) The Court addresses only Carriel's Motion in this Decision and Order.

Count One of the Indictment charged Carriel and her co-defendants with participation in a narcotics conspiracy. (See id. at 2-4.) Count Three charged Carriel and several of her co-defendants with knowingly using, possessing, and carrying firearms during and in relation to a drug trafficking crime. (See id. at 5-6.)

B. Carriel's Arrest and Pre-Miranda Questioning

The remaining facts are taken from the record presented by the parties, including a video recording of Carriel's interrogation (see Dkt. No. 619-2 (the "Video")); the waiver of rights form she signed during that interrogation, (see Dkt. No. 619-3 (the "Waiver")); Carriel's Motion; and the Government's Opposition.

Carriel was arrested on March 6, 2024. (See Opp. at 13.) Following her arrest, she was brought to an interview room at the offices of the Federal Bureau of Investigation ("FBI"). (See id.) Two FBI agents were already in the room and introduced themselves as members of the case team, "Amanda"

("Agent Amanda") and "Samir" ("Agent Samir") (collectively, the "Agents"). (See Video at 8:14:35-44.)[2]

After some preliminary conversation, Cariel explained that she was aware that there were "twelve other people arrested." (Id. at 8:15:26.) Agent Amanda responded, "Yeah, there are a bunch of people arrested today. We're talking to all of them and will let the prosecutor know, you know, what you have to say. This is kind of your opportunity. Because like you said, there's a lot of you down here today. And we know we have a lot of -- we know you have a lot of questions for us as well." (Id. at 8:15:28-59.)

Carriel asked, "So what is this case about?" (Id. at 8:17:41.) Agent Samir then read Cariel the charges against her, including by explaining that a "continuing criminal enterprise" is "when you're working like as in a group." (Id. at 8:18:04.) After confirming Carriel's biographical information, Agent Samir continued, "I'm just gonna kind of mention and we'll start talking who's in this indictment with you." (Id. at 8:19:30.) Carriel responded, "Yeah I would love

[2] When citing the Video, the Court refers to the times of day, rather than the runtime, reflected in the Video. All timestamps are in the AM, which the Court omits in-line for clarity.

to know." (Id. at 8:19:38.) Agent Samir then replied, "I'm going to print it out for you, but just to see if names ring a bell." (Id. at 8:19:42.)

For the next two minutes, Agent Samir read the names of Cariel's co-defendants to her. (See id. at 8:19:42-8:20:58.) The Video reflects that after Agent Samir read each name in the indictment, paused, waited for Carriel to respond, and looked up at Carriel to observe her responses. Carriel responded after Agent Samir read each name. In some cases, Carriel stated she simply did not know the person. In others, her statements were more substantive. For example, when Agent Samir read "Rosemarie Sanchez, a/k/a Rosie," Carriel responded, "Yeah, that's my family." (Id. at 8:19:45-53.) Similarly, when Agent Samir read, "Victor Mending, a/k/a Callie," Carriel stated, "Callie? Why does that sound familiar?" (Id. at 8:19:00-8:20:07.) Likewise, when Agent Samir read, "Damel Marcus," Carriel responded, "I just saw him. He used to kick it to me." (Id. at 8:20:30-39.)

Finally, Agent Samir named "Hector Heck Hernandez. And Edwin Malo Caresquillo," and stated: "And there's probably a reason why I read that at the last." (Id. at 8:20:50.) Carriel sighed and responded, "My cousin. Okay." (Id. at 8:21:05.)

Agent Samir then turned to Agent Amanda and stated, "Before we begin, you wanna just talk about that?" and pointed to the printed Waiver that Agent Amanda had in front of her. (Id. at 8:21:08-20.) The following exchange then ensued:

> Agent Amanda: Yeah, we just want to go –
> Carriel: He's here? Is he here?
> Agent Amanda: I'm sure you see. I'm sure we're going to talk about that.
> Carriel: I want to see. I haven't spoken to him in so long. Like --
> Agent Samir: Let's get through this part first and then we'll talk freely if you choose.
> Carriel: Oh my god.

(Id. at 8:21:20-8:21:27.)

C. The Agents' Miranda Warnings and Carriel's Responses

Agent Amanda immediately proceeded to explain and recite Carriel's Miranda warnings. Her explanation and recitation follows in full:

> I'm sure you see. I know this is your first time arrested but I'm sure you've seen enough TV shows to know we can't talk to you about the case or anything. We can't have this conversation until we get through the advice of rights. So I'm just going to read 'em to you quick and then we'll move on and we'll tell you a little bit more about why you're here, your cousin, and everything that's going on.
>
> So, before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during the questioning. If you cannot afford a lawyer, one

> will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time. Do you understand?

(Id. at 8:21:27-8:22:31.)

Throughout Agent Amanda's recitation above, Carriel appeared attentive and nodded as Agent Amanda read her rights. Further, in response to Agent Amanda's question, "Do you understand?" Carriel stated, "Yeah." (Id. at 8:22:22.) Agent Amanda then asked, "Are you good to continue this conversation?" (Id. at 8:22:22-24.) Carriel did not verbally respond but nodded her head in the affirmative. (See id. at 8:22:22-28.)

Agent Amanda then passed Carriel the Waiver and held out a pen. (Id. at 8:22:41.) Carriel signed the Waiver. (Id. at 8:22:51.) The signed Waiver lists Carriel's Miranda rights, as well as a consent for Carriel to sign, which states, "I have read this statement of my rights and I understand what my rights are. At this time I am willing to answer questions without a lawyer present." (Waiver.) Carriel signed immediately below the consent, and Agent Samir signed as a witness. (See id.) The interrogation continued immediately after Carriel signed the Waiver.

D. Carriel's Post-Miranda Statements

Over the next approximately two hours, Carriel made several incriminating statements. Among other things, Carriel voluntarily named and identified an unindicted coconspirator (see Video at 9:07:00-9:11:22); admitted that her co-defendant Edwin Carrasquillo ("Carrasquillo") had informed her about a shootout at which he was present on Valentine Avenue in or about 2020 (see id. at 9:23, 9:44-9:45); and acknowledged that she "knew what was going on on Valentine," including what Carrasquillo "was doing[.]" (Id. at 9:29.) Carriel also admitted that she let Carrasquillo live with her for a few months in the summer of 2020, allowed him access to a closet in her home, and that she stored thousands of dollars for him in her house. (See id. 9:30-9:32, 9:36-9:37.) Further, Carriel admitted that once she drove a firearm to the unindicted coconspirator whom she had previously named after he told her he left the firearm in her car. (See id. at 10:07-10:09.)

## II. CARRIEL'S MOTION

Carriel now seeks to suppress all statements she made during the Interrogation. In support, Carriel advances several arguments. First, she argues that the Agents obtained her pre-Miranda statements in violation of Miranda. (See Mot.

at 6-7.) Second, Carriel argues the Agents conducted an impermissible "two-step" interrogation – in which the Agents first questioned her, administered her Miranda rights in the middle of the interrogation, then continued the interrogation. (See id. at 4-9.) Carriel argues the Agents' purported two-step tactic violated Miranda and requires this Court to suppress all the statements she made. (See id. at 8-9.) Third, Carriel argues that the Court should suppress the post-Miranda statements – regardless of whether the Agents engaged in a two-step interrogation - because she did not knowingly and voluntarily waive her Miranda rights. (See id. at 9-11.)

## III. DISCUSSION

"'The purpose of the Miranda warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary.'" United States v. Capers, 627 F.3d at 470, 474 (2d Cir. 2010) (quoting United States v. Carter, 489 F.3d 528, 534 (2d Cir. 2007)). Miranda requires that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used

as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444.

A. Two-Step Interrogation

Carriel argues first that the Court should suppress the statements she made during her interrogation because the Agents engaged in an impermissible, two-step interrogation by administering her Miranda rights in the middle of her interrogation. (See Mot. at 5-8.) As described below, the Court holds that: (1) the Agents obtained Carriel's pre-Miranda statements in violation of Miranda, but (2) the Agents did not engage in an impermissible two-step interrogation requiring that this Court suppress her statements.

1. Governing Law

This Court must undertake a two-step analysis to determine whether the Agents subjected Carriel to an impermissible, two-step interrogation. First, the Court must determine whether "the initial statement, though voluntary, [was] obtained in violation of the defendant's Miranda rights[.]" United States v. Moore, 670 F.3d 222, 229 (2d Cir. 2012). At this first step, the Government violates a suspect's Miranda rights by interrogating the suspect in custody before

advising the suspect of their rights. See Miranda, 384 U.S. at 444.

Second, if "the initial statement *was* obtained in violation of the defendant's Miranda rights," the Court must determine whether "the government demonstrated by a preponderance of the evidence, and in light of the totality of the objective and subjective evidence, that it did *not* engage in a deliberate two-step process calculated to undermine the defendant's Miranda rights[.]" Moore, 670 F.3d at 229-30 (citation and quotation marks omitted). The Court does so "to shed light on the [Agents'] intent." Id. at 230 (footnote omitted). The Court's analysis is "guided by—but not limited to" five considerations promulgated by the plurality in Missouri v. Siebert, 542 U.S. 600 (2004); Moore, 670 F.3d at 230. Those considerations are:

> (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and second interrogations, (4) the continuity of [law enforcement] personnel doing the questioning, and (5) the degree to which the interrogator's questions treated the second round as continuous with the first.

Moore, 670 F.3d at 228 (quoting Siebert, 542 U.S. at 615 (plurality op.)) (quotation marks omitted).

2. Did the Agents Interrogate Carriel by Reading the Names of Her Co-Defendants to "Ring Any Bells"?

The parties dispute at the outset whether the Agents' reading Carriel the names of her co-defendants to see if those names "[rang] a bell" constituted an interrogation under Miranda and its progeny. (See Mot. at 6-8; Opp. at 18-19.)

"[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of" law enforcement that they "should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). The Court "focuses primarily upon the perceptions of the suspect, rather than the intent of" the Agents to determine whether the Agents' words or actions were "reasonably likely to elicit an incriminating response from" Carriel. Id. at 301 (footnote omitted).

"The relationship of the question asked to the crime suspected is highly relevant" to this inquiry. United States v. Johnson, No. 22-CR-6188, 2023 WL 8003836, at *3 (W.D.N.Y. Nov. 17, 2023) (citing United States v. Casiano, 862 F. Supp. 52, 54 (S.D.N.Y. 1994)); see also United States v. Garcia, No. 96-CR-115, 1996 WL 544233, at *9 (S.D.N.Y. Sept. 25, 1996).

To start, the Agents' words and actions during the pre-Miranda phase of the Video demonstrate they knew or should have known they were likely to elicit incriminating information from Carriel. See Innis, 446 U.S. at 302. Agent Samir began by stating he would read the names of Carriel's co-defendants "just to see if [the] names ring a bell." (Video at 8:19:42.) The Court "focuses primarily upon the perceptions of" Carriel to determine what she would have understood that phrase to mean. Innis, 446 U.S. at 301. The common meaning of the phrase "ring a bell" is "to sound familiar." Ring a bell, Cambridge Dictionary Online, https://dictionary.cambridge.org/dictionary/english/ring-a-bell (last visited October 6, 2026).

The Government argues that when Agent Samir read Carriel the names of her co-defendants to see if they "ring a bell," he "must have been conceiving of the figurative and internal bell when a mental connection is made and an internal 'ding' sounds." (Opp. at 19.) That argument is tenuous at best, especially given that Agent Samir did not tell Carriel to keep any such thoughts to herself in light of her right to remain silent. See Miranda, 384 U.S. at 444.

Even if Agent Samir intended for Carriel to keep her thoughts to herself, he "either knew or *should have known*" that reading the names of her co-defendants was "reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 301 (internal quotation mark omitted). That is because after Agent Samir read the first list of names, Carriel immediately responded by stating, "Yeah, that's my family." (Video at 8:19:45-53.) Agent Samir was thus on notice that Carriel would respond to the names he listed, including by discussing her association with these co-defendants. Yet, Agent Samir continued reading the names of Carriel's co-defendants, looking at her while waiting for responses, and repeating the process. (See id. at 8:19:45-53.) Those facts are highly probative evidence that Agent Samir was interrogating Carriel under Miranda.

That conclusion is reinforced by the relationship between Agent Samir's prompting and the "crime suspected[.]" Johnson, 2023 WL 8003836, at *3. The Indictment charged Carriel and her co-defendants with, among other things, participation in a narcotics conspiracy. (See Indictment at 2-4.) While "mere association with conspirators does not establish participation in a conspiracy," United States v.

Rios, 856 F.2d 493, 496 (2d Cir. 1988), "to be guilty of conspiracy the defendant must at least have had knowledge that a common endeavor existed," which can be proven with circumstantial evidence. United States v. Nusraty, 867 F.2d 759, 763 (2d Cir. 1989).

Carriel acknowledged knowing several of her alleged co-conspirators and even having seen some of them in response to Agent Samir's reading of their names. (See Video at 8:19:42-8:20:58.) Those responses constitute arguably probative circumstantial evidence that may tend to prove her knowledge of the existence of the alleged "common endeavor." Nusraty, 867 F.2d at 763. Indeed, the Government cites Carriel having named an unindicted co-conspirator as an "incriminating statement[]," indicating that Carriel's knowledge of the identities of the members of the conspiracy was inculpatory. (Opp. at 15.) At minimum, her statements were certainly more inculpatory than if she had stayed silent. The connection between Agent Samir's prompting and the charged conspiracy suggests that Agent Samir's solicitation of her knowledge of the identities of her alleged co-conspirators was an interrogation for the purposes of Miranda. See Johnson, 2023 WL 8003836, at *3.

Further, the Video demonstrates that after Agent Samir read each set of names, he paused and looked at Carriel to observe her responses. (See, e.g., Video at 8:19:42-8:20:58.) That, too, indicates Agent Samir intended to interrogate Carriel and that Carriel would have perceived the interaction as such. As Carriel argues, (see Mot. at 7), actions by law enforcement that are intended to elicit a testimonial response can constitute the "functional equivalent" of an interrogation, triggering Miranda's safeguards. See Innis, 446 U.S. at 301 (1980). Similarly, a suspect's nonverbal responses may be testimonial and incriminatory. See, e.g., Doe v. United States, 487 U.S. 201, 210 (1988) (act is "testimonial" if it "explicitly or implicitly, relate[s] a factual assertion or disclose[s] information").

Here, Agent Samir's reading of Carriel's co-defendants' names, then pausing and looking to Carriel for a response, amounted to actions that were "reasonably likely to elicit an incriminating response," Innis, 446 U.S. at 301, constituting an interrogation. Agent Samir's actions were intended to determine whether Carriel had any reaction to her co-defendants being named in the Indictment. Carriel's nonverbal reactions may have "relate[d] a factual assertion or

disclose[d] information," Doe, 487 U.S. at 210, including her knowledge of or relationships with her codefendants. Those reactions may have constituted incriminatory circumstantial evidence tending to prove her knowledge of the existence of the alleged "common endeavor," Nusraty, 867 F.2d at 763, thus constituting an interrogation. See also Gallo-Moreno, 584 at 756-57.

In sum, the Court concludes that Agent Samir's reading the names of Carriel's co-defendants and waiting for her to respond constituted an interrogation for the purposes of Miranda and its progeny.

3. Were the Initial Statements Obtained in Violation of Miranda?

Having determined that the Agents' reading of the names of Carriel's co-defendants to "ring a bell" and waiting for her to respond constituted an "interrogation," the Court next considers whether law enforcement obtained the statements Carriel made before being advised of her rights in violation of Miranda. See Moore, 670 F.3d at 229.

The law is clear: the Agents obtained Carriel's pre-warning statements in violation of Miranda because they did not advise her of her Miranda rights before the first round of the interrogation. See Miranda, 384 U.S. at 444.

Although the Court holds that law enforcement obtained Carriel's pre-Miranda statements in violation of Miranda, her Motion to suppress those statements is moot because the Government has represented it will not introduce those statements. (See Opp. at 19 n.10 ("[T]he Government has no intention of introducing any pre-Miranda statements in the interview room.").) See, e.g., United States v. Booth, 583 F. Supp. 3d 545, 553 (S.D.N.Y. 2022) (motion to suppress statements moot where government represented it would not offer statements in case-in-chief); United States v. Abdalla, 334 F. Supp. 3d 582, 588 (S.D.N.Y. 2018) (similar).

The Court, therefore, denies Carriel's motion to the extent she seeks to suppress her pre-warning statements as moot. The Court's ruling on that portion of Carriel's Motion, however, does not end its review of her challenge to the alleged two-step interrogation.

4. Did Law Enforcement Engage in an Impermissible, "Two-Step" Interrogation?

Because the Court has concluded that Carriel's pre-Miranda statements were obtained in violation of her Miranda rights, the Court proceeds to the next step of the inquiry: whether "the government [has] demonstrated by a preponderance of the evidence, and in light of the totality of the objective

and subjective evidence, that it did *not* engage in a deliberate two-step process calculated to undermine [Carriel's] Miranda rights[.]" Moore, 670 F.3d at 230. The Court "review[s] the totality of the objective and subjective evidence surrounding the interrogations," "guided by-but not limited to" the five Siebert considerations. Moore, 670 F.3d at 228, 230.

The Government and Carriel agree that the third and fourth considerations – "the timing and setting of the first and second interrogations," and "the continuity of [law enforcement] personnel doing the questioning," Siebert, 542 U.S. at 616 - weigh in Carriel's favor, because the two interrogations took place just minutes apart in the same room and were conducted by the same Agents. (See Mot. at 9; Opp. at 19.) The Court agrees and reviews the remaining considerations in greater depth.

a. The Completeness and Detail of the First Interrogation

As to the first Siebert consideration, the Court reviews "the completeness and detail of the questions and answers in the first round of interrogation." Seibert, 542 U.S. at 615. Here, the questions and answers in the first round of

interrogation were neither complete nor detailed. Agent Samir merely read the names of Carriel's co-defendants and looked up to observe her reaction. (See Video at 8:19:42-8:20:58.) At most, Carriel acknowledged that some co-defendants were members of her family, that she "just saw" her co-defendant Demel Shank Marcus, and that her co-defendant Edwin Malo Carrasquillo was her cousin, to whom she had not "spoken . . . in so long." (Video at 8:20:30-8:21:27.)

Carriel's initial interrogation was far less complete and detailed than those that courts have found suggestive of a two-step interrogation. For example, in Siebert, the defendant gave a full confession across over an hour of interrogation, which was "systematic, exhaustive, and managed with psychological skill," and left "little, if anything, of incriminating potential . . . unsaid," before receiving his Miranda warnings. Seibert, 542 U.S. at 604-05, 616. In United States v. Capers, the defendant was questioned about the location of envelopes he was suspected of stealing, where he obtained them, and to whom they belonged, before being informed of his rights. 627 F.3d 470, 473, 481-83 (2d Cir. 2010). In each case, the court found the pre-Miranda questioning to be sufficiently complete and detailed because

the questions and answers amounted to nearly complete interrogations and resulting confessions. See Siebert, 542 U.S. at 616; Capers, 627 F.3d at 483.

Courts have also routinely found pre-Miranda questioning that elicits inculpatory information from a suspect to be *insufficiently* complete and detailed to meet the first Siebert consideration. In United States v. Carter, 489 F.3d 528 (2d Cir. 2007), the court found no two-step interrogation, where law enforcement asked the defendant "only one question regarding the contents of one of the bags of narcotics" – even where the defendant admitted that the bag contained cocaine. Id. at 536. Similarly, in Moore, law enforcement asked the defendant about where he had hidden an unlawfully possessed gun and the defendant drew a map directing law enforcement to the critical evidence. 670 F.3d at 226. The Second Circuit held that line of questioning to be "brief and spare." Id. at 231.

These cases demonstrate together that Carriel's initial interrogation was not complete or detailed under Siebert. The Agents merely read Carriel the names of her co-defendants over the course of less than three minutes, and Carriel responded by acknowledging she knew some of her co-defendants

and mentioned familial ties. That interrogation was "brief and spare," Moore, 670 F.3d at 231, and certainly far less complete and detailed than the interrogations in Carter and Moore. The first Siebert consideration therefore counsels strongly against a finding that the Agents conducted a deliberate two-step interrogation of Carriel.

b. Overlapping Content

On the second Siebert consideration, there was little "overlapping content" between the statements Carriel made in the two interrogations. Siebert, 542 U.S. at 615. In the first phase, Carriel merely acknowledged knowing some of the defendants and having familial ties with a few of them. She also mentioned having seen them at unspecified times. (See 8:19:42-8:20:58.) Contrast that with her post-Miranda statements. There, she acknowledged, among other things, that she knew Carrasquillo was dealing drugs, that she held thousands of dollars in cash for him, and that she had transported a firearm. (See Video at 9:30-9:32, 9:36-9:37, 10:07-10:09.) Those statements went far beyond those she made during the first phase – in which she merely acknowledged knowing some of the co-defendants – and were, instead,

statements that went to her potential involvement in the alleged conspiracy itself.

Courts have routinely found that where, as here, the initial interrogation was spare, but the later interrogation involved broad or more fulsome discussion, there was little overlap between the two phases. See, e.g., Moore, 670 F.3d at 231 (Whereas the initial questioning focused exclusively on the location of the gun, the second questioning was broad and systematic . . . . The two rounds of questioning did not appreciably overlap.”); Carter, 489 F.3d at 536 (“almost no overlap” between phases where defendant only made one pre-warning inculpatory statement then made a “full confession he gave after he received the warnings”).

The lack of “overlapping content” between the statements Carriel made in the two phases strongly suggests that the Agents did not deliberately engage in a two-step interrogation. Siebert, 542 U.S. at 615.

c. Continuity of Interrogations

As to the fifth Siebert consideration, the Court reviews whether the Agents treated the two stages as “continuous.” Siebert, 542 U.S. at 615. The Court finds this consideration is, on balance, neutral. On one hand, as the Government

concedes, Carriel's "last pre-*Miranda* statements concern[ed] Carrasquillo, her admitted cousin, and . . . the post-Miranda questioning picks up at that point," (Opp. at 19), suggesting continuity between the two phases. Likewise, after advising Carriel of her Miranda rights, Agent Amanda asked her if she was "good to *continue* this conversation[.]" (Video at 8:22:22-24.) Further, there was no break between the two rounds of questioning that would cut against a finding of continuity. Contra Moore, 670 F.3d at 222-23 (ninety-minute-long break between rounds of interrogation suggested no continuity); Carter, 489 F.3d at 536 (hour-long break weighed against continuity).

On the other hand, "nothing in the record suggests that the latter session was essentially a cross-examination using information gained during the first round of interrogation," United States v. Williams, 681 F.3d 35, 45 (2d Cir. 2012); or that the Agents "relied on the defendant's prewarning statement to obtain the postwarning statement." Siebert, 542 U.S. at 621 (Kennedy, J., concurring). In other words, while the two rounds of the interrogation were continuous in time, they were discontinuous in content, as the second interrogation focused on substantive aspects of the

conspiracy rather than the mere identities of the co-defendants and familial relations between them. For these reasons, the Court finds that this consideration is neutral.

While the Court finds that two Siebert considerations weigh in each side's favor and the fifth is neutral, that math is not dispositive. This Court's review of the Agents' interrogations of Carriel is "not limited to" the Siebert considerations and must, instead, be guided by "the totality of the objective and subjective evidence[.]" Moore, 670 F.3d at 230 (quotation marks omitted). By that measure, the Court holds that the Agents "did *not* engage in a deliberate two-step process calculated to undermine [Carriel's] Miranda rights[.]" Id.

The totality of the evidence demonstrates the Agents did not engage in a "question-first" tactic that rendered Carriel's "Miranda warnings ineffective by waiting for a particularly opportune time to give them, after [Carriel] ha[d] already confessed." Seibert, 542 U.S. at 611. The first phase of the interrogation lasted only three minutes, did not involve substantive questioning about the nature of the crimes charged, and elicited the barest amount of inculpatory information – whether Carriel knew her co-defendants. The

second phase, in contrast, was nearly two hours long, involved questions regarding the core criminal conduct alleged in the indictment, and went far beyond whether Carriel merely knew her co-conspirators.

Critically, the evidence demonstrates the Agents intervened to prevent Carriel from making substantive, inculpatory statements before she was read her rights. Put differently, far from being a "particularly opportune time" for the Agents to read Carriel her rights "after [Carriel] ha[d] already confessed," id., the Agents stopped Carriel to advise her of her rights before she did so. When Carriel tried to begin discussing the nature of her relationship with Carrasquillo, Agent Samir interjected by stating, "Let's get to this part first," i.e., advising Carriel of her rights. (Video at 8:21:20-8:21:27.) Agent Amanda immediately agreed, stating, "We can't have this conversation until we get through the rights." (Id. at 8:21:27-8:22:31.) Agent Amanda then immediately read Carriel her Miranda rights; Carriel verbally acknowledged she understood them; and Carriel signed the Waiver immediately thereafter. (Id. at 8:21:27-8:22:51.) That the Agents stopped Carriel from making substantively inculpatory statements by first advising her of her rights

and twice obtaining her waiver of those rights strongly suggests the Agents did not intend to conduct an impermissible two-step interrogation. See Moore, 670 F.3d at 230 (Court undertakes analysis of Seibert considerations "to shed light on the [Agents'] intent").

The Court holds that, in light of the totality of the objective and subjective evidence, see id. at 230, the Government has demonstrated by a preponderance of the evidence that the Agents did not conduct a "deliberate two-step strategy," Siebert, 542 U.S. at 603, intended to violate Carriel's Miranda rights.

B. Carriel's Waivers of Her Miranda Rights

Because the Court holds that the Government has proven, by a preponderance of the evidence, that the Agents did not engage in a deliberate two-step interrogation, the Court next considers whether Carriel made her post-warning statements voluntarily. See Moore, 670 F.3d at 230 (holding if there was no two-step interrogation, "the defendant's post-warning statement is admissible so long as it, too, was voluntary").

Carriel argues that her post-warning statements should be suppressed because she neither voluntarily nor knowingly waived her rights. (See Mot. at 9-11.) For the reasons below,

the Court holds that Carriel knowingly and voluntarily waived her Miranda rights.

1. Governing Law

Where, as here, a defendant does not affirmatively invoke their rights during a custodial interrogation, the Government bears the burden of demonstrating, by a preponderance of the evidence, that the defendant waived her rights knowingly and voluntarily. See, e.g., United States v. Plugh, 648 F.3d 118, 128 (2d Cir. 2011); Berghuis v. Thompkins, 560 U.S. 370, 382-84 (2010); Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).

In general, a defendant's waiver is "knowing" when she makes it "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Plugh, 648 F.3d at 127 (citation and quotation marks omitted). A waiver is "voluntary" where "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. (citation and quotation marks omitted).

Further, when law enforcement advises a suspect of their Miranda rights, "no talismanic incantation is required to satisfy Miranda's strictures." Siebert, 542 U.S. at 611

(cleaned up). Instead, "the inquiry is simply whether the warnings reasonably convey[ed] to a suspect [her] rights as required by Miranda." Id. (cleaned up).

2. Carriel's Waivers

Carriel argues that her waivers were neither knowing nor voluntary for two main reasons. First, she contends that Agent Amanda informed Carriel of her rights "hurriedly" and "sloppily" in a manner that "not so subtly watered down the importance of the rights[.]" (Mot. at 9-10.) Carriel claims Agent Amanda read the rights too speedily and should have asked her whether she understood each right individually. (See id. 10.) Second, Carriel argues that the Agents did not properly ask Carriel whether she was willing to waive her rights and continue the conversation. (See id. at 10.)

As an initial matter, Carriel does not, and cannot, dispute that Agent Amanda read Carriel her Miranda rights. (See Video at 8:21:27-8:22:31.) After reading Carriel her rights, Agent Amanda immediately asked Carriel, "Do you understand?" and Carriel responded, "Yeah." (Id. at 8:22:22.) Agent Amanda then asked Carriel if she was "good to continue this conversation?" to which Carriel nodded affirmatively. (Video at 8:22:22-28.) It is further undisputed that Carriel

then signed the Waiver, which again advised her of her Miranda rights, indicating her understanding of her rights and willingness to proceed with the interrogation. (See Waiver.)

The Second Circuit has routinely found waivers of a suspect's Miranda rights to be both knowing and voluntary where, as here, the suspect agreed to waive their rights absent coercion. See, e.g., Moore, 670 F.3d at 233 ("Moore was advised of his rights before the later interrogation, and he agreed (orally and in writing) to waive them. There is no dispute that he was fully advised of his rights and that he knowingly and voluntarily waived them."); Plugh, 648 F.3d at 1127 (waiver knowing and voluntary where defendant "sign[ed] an express 'waiver-of-rights' form before making the inculpatory statements in question"); Spencer, 995 F.2d at 12 (waiver knowing and voluntary where defendant testified that he "was presented with an FBI waiver form describing his Miranda rights, . . . he read the form, and . . . he understood all his rights").

This case is no different. Carriel twice waived her rights – orally and in writing – "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," making her waiver

knowing. Plugh, 648 F.3d at 127. The record demonstrates that Carriel's two waivers were "the product of . . . free and deliberate choice[s] rather than intimidation, coercion, or deception," making those waivers voluntary. Id. (citation and quotation marks omitted); Siebert, 542 U.S. at 611 (cleaned up).

Carriel nonetheless argues that Agent Amanda's wording and delivery "watered down the importance of the rights," constituting coercion. (Mot. at 9.) The Court is unpersuaded. Carriel first argues that Agent Amanda undermined the knowingness and voluntariness of Carriel's waivers because Agent Amanda "speedily read the warnings but did not ask Ms. Carriel after each right if she understood." (Mot. at 10.) The Court observes that Agent Amanda read Carriel her Miranda rights in a steady, deliberate manner, rather than "hurriedly," as Carriel claims. (Compare Mot. at 9, with Video at 8:21:27-8:22:31.) And Carriel verbally acknowledged she understood her rights, then signed the Waiver, indicating her waiver was knowing and voluntary.

Carriel also argues that Agent Amanda's invocation of "fictionalized TV shows," undermined Carriel's waivers, (Mot. at 9), but the totality of the evidence demonstrates

otherwise. Agent Amanda prefaced reading Carriel her rights by stating, among other things, "I'm sure you've seen enough TV shows to know we can't talk to you about the case or anything." (Video at 8:21:27-8:22:31.) After Agent Amanda then read Carriel her Miranda rights, Carriel confirmed she understood those rights – both verbally and by signing the waiver. (See Video at 8:21:27-8:22:51.)

The Court holds that Carriel understood all her rights, as demonstrated by her verbal confirmation and written signature of the consent on the waiver form. There is "no talismanic incantation is required to satisfy Miranda's strictures," Siebert, 542 U.S. at 611, and under the circumstances, the fact that Agent Amanda did not ask if Carriel understood each right did not undermine the knowingness and voluntariness of Carriel's waivers. Further, Agent Amanda read the rights at a deliberate pace, but even if she had not, the record demonstrates Carriel understood her rights, so the speed of the recitation also did not undermine her waivers. See, e.g., United States v. Green, No. 20-CR-110, 2021 WL 2367047 (W.D.N.Y. Mar. 31, 2021) (rejecting claim that Miranda warnings read "so quickly" were ineffective because record demonstrated suspect understood

rights, and collecting similar cases). Nor did the reference to television undermine Carriel's waivers because, on this record, there is no indication that reference affected Carriel's knowingness or voluntariness. See, e.g., Morris v. Thornell, No. 17-CV-926, 2025 WL 3514322, at *81 (D. Ariz. Dec. 8, 2025) (waiver deemed knowing where police prefaced Miranda warnings by explaining "that it is 'just like on tv,'" because suspect confirmed he understood his rights).

The Court holds that the Government has demonstrated, by a preponderance of the evidence, that Carriel both knowingly and voluntarily waived her Miranda rights.

## IV. ORDER

For the foregoing reasons it is hereby

**ORDERED** that the Motion of Defendant Delilah Carriel ("Carriel") to Exclude Statements (Dkt. No. 557) is **DENIED** as **MOOT** to the extent Carriel seeks to exclude her pre-Miranda statements; and it is further

**ORDERED** that Carriel's Motion is otherwise **DENIED.**

**SO ORDERED.**

Dated: 6 October 2026
New York, New York

Victor Marrero
U.S.D.J.